## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:23-CR-42-PPS |
| | ) | 2:20-CR-24 |
| KYRAN HAWTHORNE, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Kyran Hawthorne is charged with being a felon in possession of a firearm in cause number 2:23-cr-42, and a violation of his supervised release in cause number 2:20-cr-24. Hawthorne has filed identical motions in the two cases, asking to suppress firearms seized during a search of his house in Gary, claiming that the search was not supported by probable cause. Hawthorne sought a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), and although I thought it was a close call whether a hearing was necessary, in an abundance of caution I held an evidentiary hearing on March 14, 2024.

The motion to suppress filed in Case No. 2:20-cr-24 contains additional exhibits (like the search warrant and affidavit in question) that were not filed in Case No. 2:23-cr-42. Therefore, unless otherwise specified, for purposes of this motion, I'll refer to the docket entries in Case No. 2:20-cr-24. But going forward, to avoid confusion, the parties are ordered to file all documents only in the new case—2:23-cr-42.

## Factual Background

The facts in this case come from the briefs, the exhibits attached thereto, and my recollection of the testimony given at the Franks hearing. Only Detective Justin Clark (author of the probable cause affidavit) testified at the hearing.

On May 22, 2023, the body of a deceased man named Kurt Day was found in a wooded area in Gary. He had been shot in the chest and his body had been burnt. [DE 71 at 6.] Gary Police Detective Justin Clark was assigned the investigation, and after interviewing a number of people, Clark's investigation started to focus on Kyran Hawthorne who lived at 4147 Massachusetts St. in Gary. On May 26, 2023, Clark applied for a search warrant at that address with Lake County Judge Amy Jorgensen. [DE 71 at 3.] The warrant was seeking evidence relating to the crime of murder, and in particular the murder of Mr. Day. *Id.* A lengthy affidavit was submitted in support of the warrant application. [*Id.* at 4-9.] Firearms were recovered from the house, and a month later, Hawthorne was charged in this case with being a felon in possession of a firearm. [*See* DE 1 in cause No. 2:23-cr-42.] Clark testified that the murder investigation is still ongoing.

Hawthorne challenges the search warrant on the grounds that Clark's affidavit contained intentionally or recklessly made material misstatements or omissions and, accordingly, the affidavit lacked probable cause. The facts are convoluted, and the affidavit in support of the search warrant doesn't help matters. With all due respect to Detective Clark, who I'm sure was operating under a time crunch, the affidavit is

2

awfully confusing.  As best I can tell, here's what Detective Clark swore to when he applied for the warrant:

Clark stated in his affidavit that a body that appeared to have been burnt to death was found in a wooded area on May 22, 2023. [DE 71 at 5.]  Mr. Day had been reported missing the day before, and when they later fingerprinted the body, the authorities determined it was indeed Day. *Id.*  After speaking with Mr. Day's mom (Joanna[1] Moore), the police went to impound Day's vehicle.  *Id.*  They found it at 2521 Connecticut Street, a building owned by Cordell Johnson.  According to Officer Clark's affidavit, Dontaineun Cain and Imani Guider lived in the basement apartment of Johnson's building. [*Id.* at 6.]  Johnson lived upstairs in the "multi-dwelling." *Id*.

Another detective working on the case, Detective Clouse, spoke with Johnson who told Clouse he "believed that Dontaineun Cain and Imani Guider had something to do with the disappearance of Kurt Day." *Id.*  Clouse found Johnson to be credible for no other reason than he had personal knowledge of the facts he relayed to Clouse. *Id.* According to Johnson, Guider and Cain were in a relationship together.  Johnson further told Det. Clouse that on the night of May 20th, he was at his home when Cain, Guider, and Day arrived at the house.  *Id.*  Cain then announced that the trio (Cain, Guider, and Day) were going to a party.  *Id.*

---

[1] Although the affidavit refers to "Joanna" Moore there was some testimony that her real name is "Joanne." [DE 71 at 7.]  I will refer to her as Joanna Moore since that is consistent with the affidavit.

Joanna Moore, Day's mother, took it upon herself to investigate the disappearance of her son. Moore told officers she spoke to a male with the nickname "Skillet" who told her there were shots fired on 41st Avenue. [*Id.* at 7.] Moore told Detective Clouse that Cordell Johnson, Imani Guider, and "Walter" had given her conflicting reports of Day's disappearance. Day's mother had questioned Cain and Guider about the whereabouts of Day, and the couple told her they went to a party with Day by 45th Avenue and Washington Street in Gary, and then Day went on to a party near 41st street. [*Id.* at 7.] Continuing in her quest to find out what happened to her son, Moore also called someone named Tremaine Harris. According to Moore, Harris stated "they had to kill him" and he was advised that "G" and "Killa" were responsible for killing Day. *Id.* Through his police work, Officer Clark knew that Kyran Hawthorne goes by "Killa K." *Id.*

Clark was able to identify the house at 4147 Massachusetts Street as Hawthorne's house. *Id.* He discovered Hawthorne was on home detention, and contacted Lisa Exl at the Lake County Community Corrections, who provided location data for Hawthorne and confirmed he lived at the house on Massachusetts Street. *Id.* During the hearing, Clark testified credibly that he only considered the GPS data for the sole reason of determining whether Hawthorne lived at 4147 Massachusetts Street. He did not analyze the printout to see if Hawthorne was present at his residence at the time of the shooting, nor did he look at the data to see if Hawthorne was outside of his house at the

time Cain reported Hawthorne was threatening him in a car (an incident I'll discuss in a moment). [DE 71 at 10-17.]

On May 24, 2023, Det. Clark interviewed Guider at the police station. [*Id.* at 7.] She stated that on May 20, she, Cain, and Day went to Chicago to hang out and returned to Gary around sunset. *Id.* In Gary, they met some acquaintances. Later in the night, Cain, Guider and Day got into a white van and were dropped off at a taco stand at 41st Avenue and Broadway in Gary. *Id.* They then went to a residence on 41st Avenue, near Massachusetts Street. Guider said while the trio was outside talking with other people, shots were fired. *Id.* Guider said after the shooting she and Cain left the scene, but they couldn't locate Day. [*Id.* at 8.]

Guider also told the police in her interview that several days later she and Cain got into a white SUV with "Killa," and "Killa" pointed a gun to Cain's head and said something to him, but Cain was able to exit the vehicle and run. *Id.* This account from Guider is corroborated in another section of the affidavit where it recounts that Cain made a 911 call shortly after being threatened by Hawthorne. [*Id.* at 6.] According to the police report, Cain stated that he and Guider were passengers in a white car driven by Hawthorne when Hawthorne asked Cain if he spoke to police about a murder that occurred in the 4100 block of Massachusetts Street in Gary. [*Id.* at 6.] When Cain told Hawthorne he didn't speak to police, Hawthorne pulled out a silver handgun and pointed it at Cain's head. *Id.* Cain tried to grab the firearm, but then managed to exit the car and hide in the bushes. *Id.*

Cain also gave a voluntary interview to law enforcement.  Cain stated that on May 20, he, Guider, and Day entered a white panel van that Cain owned. [*Id.* at 8.]  The trio went to a residence on 41st Avenue near Massachusetts Street.  *Id.*  Guider and Day then walked to "Killa's" house on Massachusetts Street to buy drugs.  *Id.*  According to Cain, he then heard a loud commotion and then gunfire.  *Id.*  Cain stated Guider told him that she saw "Moe" shoot Day. The affidavit provides the reader no clue who exactly "Moe" is.  However, it does say that Cain picked Hawthorne out of a photo lineup, identifying him as "Killa."  *Id.*  Cain also identified 4147 Massachusetts Street as Hawthorne's residence where the shooting occurred.  *Id.*

Clark's affidavit concludes by him reciting that he believed probable cause existed to search 4147 Massachusetts Street because it appeared to be the location where Day was shot and killed. *Id.*  The search was for items like firearms, bullets/casings, blood, human tissue or DNA, surveillance systems, home security systems, cellular devices, illegal drugs, and flammables and accelerants. [DE 71 at 8.]

Hawthorne attacks the affidavit supporting the search of his house for items related to the murder of Kurt Day.  Here are the shortcomings with the affidavit, according to Hawthorne:

> Here, Clark's affidavit was inaccurate or misleading in several respects.  First, Clark recites that Joanna Moore had questioned Imani Guider, Cordell Johnson, and 'Walter.'  Clark recites that each of those three individuals gave conflicting reports about Day's disappearance but curiously fails to reveal what those inconsistencies were.  When Cordell Johnson was questioned by Clark, he likewise revealed that Guider and Cain gave multiple

accounts of what happened to Day but again Clark failed to recite what those accounts are or what the inconsistencies were.

Most glaringly, Clark's affidavit recites that Cain had called 911 at 12:11 a.m. on May 23, 2023 complaining that he had been threatened by Kyran Hawthorne. Later on in the affidavit, Clark reveals that he obtained from Lisa Exl at Lake County Community Corrections the GPS data for Kyran Hawthorne on May 23, 2023 between 12:00 and 12:30 a.m. Clark's affidavit fails to recite that during the time period that Cain was allegedly being threatened by Hawthorne, he was in fact at his residence and therefore could not have made the threat as Cain had suggested nor in the location Cain claimed. This information was either intentionally or recklessly withheld from the Commissioner.

Clark further recited in his affidavit that Tremaine Harris had told Joanna Moore that 'G' and 'Killa' were responsible for killing Day. This multi-level hearsay statement was never investigated nor corroborated by Clark.

Clark further recited in his affidavit that he had been told by Dontaineun Cain that only Day and Guider walked to 'Killa's' house and that after the events transpired Guider told him that 'Moe' shot Day. Clark provided no information as to who Moe was, what his relationship was to 4147 Massachusetts, if any, or if he is in any manner affiliated with Hawthorne on any level.

[DE 72 at 3.]

## Legal Standards

"A search warrant affidavit establishes probable cause when it sets forth facts sufficient to induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime." *United States v. Gregory*, 795 F.3d 735, 741 (7th Cir. 2015) (citation omitted). Where the issuance of a search warrant is based entirely on an affidavit, "the validity of the warrant depends solely on the strength of the affidavit." *United States v. Johnson*, 867 F.3d 737, 741 (7th Cir. 2017), citing *United States v. Carson*,

582 F.3d 827, 831-32 (7th Cir. 2009); *see also United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018) ("Probable cause for a search warrant exists when the supporting affidavit presents a total set of circumstances creating a fair probability that evidence of a crime will be found."). A reviewing court gives "great deference" to the conclusion of the issuing judge that there was probable cause to support the warrant. *United States v. Robinson*, 724 F.3d 878, 884 (7th Cir. 2013). Indeed, affidavits and complaints supporting warrants are presumed to be valid. *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009).

Under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the evidence recovered from a search must be suppressed it the defendant is able to prove by a preponderance of the evidence that: (1) the affidavit contained material false statements or omissions; (2) these false statements or omissions were made with deliberate or reckless disregard for the truth; and (3) these false statements or omissions were necessary to a finding of probable cause. A reviewing court will not upset a district court's factual findings unless it is "left with the definite and firm conviction that a mistake has been committed." *United States v. Sauerwein*, 5 F.3d 275, 278 (7th Cir. 1993) (quotations omitted).

*Franks* discusses the particular inquiry to be made at the hearing:

> In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of

> the search excluded to the same extent as if probable cause was
> lacking on the face of the affidavit.

*Franks*, 438 U.S. at 156.  In other words, there are two levels of inquiry that I must make

in assessing the evidence presented at a Franks hearing.  First, I have to determine

whether Hawthorne demonstrated the false information was included intentionally or

recklessly.  If not, I'm done and the firearms found during the search will not be

suppressed.  However, if Hawthorne *does* establish the false information in the affidavit

was included as a result of intentional deceit or reckless disregard, then I must

determine whether the affidavit, when stricken of the false information, is still

nevertheless sufficient to establish probable cause for issuance of the search warrant.

*See United States v. Hollins*, 2024 WL 278297, at *4 (N.D. Ind. Jan. 24, 2024) ("On the last

prong, the court is to remove any overt falsehood from the affidavit – or else

incorporate any omitted material facts that undermine probable cause, if an omission is

what rendered the affidavit misleading – and see if probable cause remains.").

At the first step, the defendant must show the misstatement or omission "was

designed to mislead or was made in reckless disregard of whether it would mislead."

*United States v. McMurtrey*, 704 F.3d 502, 511 n.5 (7th Cir. 2013).  A showing of reckless

disregard requires more than a showing of negligence and may be proved from

circumstances showing obvious reasons for the affiant to doubt the truth of the

allegations.  *Id.* at 512.  "Reckless disregard for the truth" means that "the officer

entertained serious doubts as to the truth of the statements, had obvious reasons to

doubt their accuracy, or failed to disclose facts that he or she knew would negate

probable cause." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (quotation marks and citation omitted).

**Discussion**

To be sure, Clark's affidavit is confusingly written. Yet I "begin[] with the general notion that warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Anderson*, 2024 WL 64218, at *6 (N.D. Ind. Jan. 5, 2024) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). In this case, the affidavit does establish probable cause to search Hawthorne's residence.

Let's consider the first prong of the Franks analysis - whether Clark made misstatements or omissions as a result of perjury or reckless disregard. Initially, there is no evidence whatsoever that Clark intentionally lied or committed perjury when he didn't include the specifics of the GPS data as to Hawthorne's whereabout at the time of the alleged car threat. Clark testified very believably that he did not look at the data contained in the GPS printout regarding Hawthorne's location on certain dates. Rather, all he did was confirm with Lisa Exl that Hawthorne was on supervision and that he lived at the house on 4147 Massachusetts. She gave Clark the GPS printout, but aside from verifying the address where Hawthorne lived, Clark did not look at the actual GPS data.

So, the next question is whether Clark acted with reckless disregard when he didn't analyze the GPS data that he had in his possession before he drafted the affidavit. Hawthorne claims that Clark acted with reckless disregard for the truth when he

10

included in the affidavit the alleged threat that Hawthorne made to Cain on May 23, 2023 supposedly while Cain and Guider were in Hawthorne's vehicle. Hawthorne claims if Clark had just further investigated, he would have determined that Hawthorne's GPS data placed him at his home on Massachusetts Street at the time the alleged threat took place several blocks away (at around 12:11 a.m. on May 23, 2023). [DE 71 at 10.] It is true this information is not included in the affidavit. But a key component to consider is that Clarke didn't actually *know* the GPS data placed Hawthorne at home instead of in the car threatening Cain.

An affiant acts with reckless disregard for the truth when he "in fact entertain[s] serious doubts as to the truth of his allegations." *United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008) (quotation omitted). This is a subjective inquiry that focuses on the officer's state of mind. *Id.* "A showing of reckless disregard requires more than a showing of negligence and may be proved from circumstances showing obvious reasons for the affiant to doubt the truth of the allegations." *Williams*, 718 F.3d at 650 (citing *McMurtry*, 704 F.3d at 512). Here, subjectively speaking, Clark had no reason to doubt Cain's claim that Hawthorne threatened him. Indeed, Clark verified that Cain called 911 on May 23rd at approximately 12 a.m. to report he was being threatened by Hawthorne. [DE 71 at 6.] In addition to verifying the 911 call, Cain made a report with Officer Johnson about the threat, and Guider told Clark during an interview the same story – that several days after the shooting, she and Cain got into a white SUV with Hawthorne and he held a gun to Cain's head. [*Id.* at 8.] In other words, Clark had no

11

obvious reason to doubt the truth of Cain's allegation that Hawthorne had threatened him about the killing of Day. There were several corroborating details about the threat, and nothing in the record to have given Clark an obvious reason to doubt the veracity.

I find Detective Clark's testimony on this subject credible and any misstatements or omissions in the affidavit were not intentional or reckless. As the Court reconciled in *Hueston*, it is possible to find an "affidavit is lacking. Certain details should have been included in the affidavit . . . [it] did not give a full picture of the investigation and fell short of what we expect from an investigating officer." *United States v. Hueston*, 90 F.4th at 897, 902-03 (7th Cir. Jan. 12, 2024). Nevertheless, the Seventh Circuit found the district court did not "clearly err by crediting the detectives' explanations and finding that they did not act with recklessness or a deliberate intent to mislead the issuing judge." *Id.* at 903. The Court went on to find "[t]he affidavit's misstatements and omissions were unwise – even sloppy – but the evidence in the record does not unequivocally show the detectives, including [] as the author of the affidavit, intended to mislead the issuing judge." *Id.* Likewise, while Clark might have been negligent and careless in not analyzing the GPS data, there is nothing to show he did this in order to mislead the judge or that he had reason to question Cain and Guider's account.

It is important that the GPS data also places Hawthorne at his residence *during the time of the shooting*. This highly relevant information was not included in the affidavit, either. As such, I believe the omission of the GPS data altogether reflects haste in the investigation and at most, mere negligence, rather than deliberate or reckless

disregard for the truth. *See Williams*, 718 F.3d at 650 (finding an omission of both favorable and unfavorable material provides a reasonable basis the police did not intent to mislead); *Hueston*, 90 F.4th at 903 (finding failure to include both helpful and unhelpful facts reinforces a finding of carelessness rather than intent to mislead). Thus Hawthorne hasn't met his burden of showing that a material omission was made with the intent to mislead the issuing judicial officer or with reckless disregard.

But let's suppose I were to find that Clark acted with reckless disregard when he failed to fully analyze the GPS data thus requiring me to set aside the evidence of Hawthorne threatening Cain in the car about the murder. I would still find there is enough evidence to support a finding of probable cause to search Hawthorne's house.

Day was last seen on May 20, 2023, reported missing on May 21, and found dead on May 22. Day's car was found at the residence of Guider and Cain. Johnson, who owned that building, confirmed to authorities that Cain, Guider and Day had all been together on May 20, and the trio had headed to a party. Cain and Guider both stated they were with Day shortly before his death. A male who went by "Skillet" told Day's mother (Moore) that shots were fired on 41st Avenue. Tremaine Harris also told Moore that "G" and "Killa" killed Day. It is well established that "Killa K" is Kyran Hawthorne's nickname. Guider told police that she, Cain and Day were at the corner of 41st Avenue, near Massachusetts Street, when shots were fired. After the incident, she couldn't find Day. Cain told police a similar story that he, Guider and Day were on 41st Avenue near Massachusetts Street before Guider and Day walked to Killa's nearby

house on Massachusetts Street to buy drugs. He heard gunfire and later identified a photo of Hawthorne as "Killa" and a photo of his residence (4147 Massachusetts Street) as the place where the shooting occurred.

Determining whether there is probable cause to support the issuance of a search warrant involves a "common-sense inquiry based on all the circumstances." *United States v. Bacon*, 991 F.3d 835, 840 (7th Cir. 2021) (internal quotations omitted). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Illinois v. Gates,* 462 U.S. 213, 238-39 (1983). Even setting aside the threat to Cain, I am still more than satisfied that there was a substantial basis to issue the warrant of the home on Massachusetts Street for evidence of the murder.

Cain's testimony alone, given close in time to the incident, that Guider and Day walked to Killa's house on Massachusetts Street to buy drugs, and then Cain heard a loud commotion and moments later heard gunfire, is compelling enough. Cain also specifically identified an image of 4147 Massachusetts Street and told the authorities this was Hawthorne's residence. Cain was not an anonymous tipster. Instead, he gave firsthand knowledge and he was with Day the day he died. *See United States v. Reed*, 726 F.2d 339, 342 (7th Cir. 1984) (holding information received from a reliable source "was sufficiently descriptive, current, and of apparent reliability, so the police would not be required to verify the information."). In addition, the statements by Guider,

14

Harris, Johnson, and "Skillet" all corroborate the general information that the shooting happened at or near Hawthorne's residence.

Hawthorne tries to attack several aspects of the affidavit as being inconsistent, But these alleged shortcomings don't negate probable cause.  First, Hawthorne points out that in the affidavit, Clark said "Joanna Moore advised that she questioned the individuals as to the whereabouts of Kurt Day.  According to Joanna Moore, the above listed individuals gave conflicting reports about what happened to Kurt Day." [DE 71 at 5.]  Hawthorne criticizes Clark for not "reveal[ing] what those inconsistencies were." [DE 26 at 3.] And when Cordell Johnson was questioned by Clark, he also said that Cain and Guider "gave multiple accounts of what happened to Kurt Day." [DE 71 at 6.] These statements of alleged inconsistencies came from Joanna Moore's own investigation of the death of her son and reflect Moore's perception of what Cain and Guider told her.  Clark and the authorities went on to conduct their own investigation relating to the death of Day and I don't see why Clark needed to expand on what the perceived inconsistencies were from victim's mother's investigation into the matter.

Hawthorne also argues the agent did not investigate "G" and "Moe's" role in the murder or their connection to 4147 Massachusetts Street.  During the hearing, Detective Clark said he didn't know at the time he wrote the affidavit who Moe was (he figured that out later in the investigation).  At the time he was applying for the warrant, Clark was concentrating on determining where the shooting was committed (not yet who killed Day).  The fact that the police could have done more work does not meet the high

15

standard for showing the affidavit was not foundation enough to establish probable cause. *See United States v. Jones,* 208 F.3d 603, 607 (7th Cir. 2000) ("The fact that Jones can point out additional things which could have been done but were not does not in any way detract from what was done.").

For the reasons I've already gone through, I don't find that Detective Clark acted with recklessness or a deliberate intent to mislead the judge issuing the search warrant. And, even if you could consider his failure to analyze the GPS data as reckless disregard for the truth, and even setting aside the threat that Cain claimed Hawthorne made to him in the car, there is still sufficient evidence in the affidavit to establish probable cause to search Hawthorne's residence.

### Conclusion

Therefore, Defendant Kyran Hawthorne's motion to suppress [DE 25 filed in Case No. 2:23-cr-42 and DE 71 filed in Case No. 2:20-cr-24] is DENIED.

SO ORDERED.

ENTERED: March 25, 2024.         /s/ Philip P. Simon
                                 PHILIP P. SIMON, JUDGE
                                 UNITED STATES DISTRICT COURT